## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

JEFFREY JOHN WIRTH,

      Defendant.

**MEMORANDUM AND FINDINGS OF FACT**
Criminal No. 11-256(1) ADM/JJK

---

William J. Otteson, Esq., Assistant U.S. Attorney, United States Attorney's Office, Minneapolis, MN, on behalf of Plaintiff United States of America.

Christopher W. Madel, Esq., Jennifer M. Robbins, Esq., and Aaron R. Thom, Esq., Robins Kaplan Miller & Ciresi LLP, Minneapolis, MN, on behalf of Defendant Jeffrey John Wirth.

---

## I. INTRODUCTION

On May 11, 2012, Jeffrey John Wirth pled guilty to Conspiracy to Defraud the United States in violation of Title 18, United States Code, Section 371. Mr. Wirth was sentenced on September 19, 2012. Pursuant to the Mandatory Victim's Restitution Act (MVRA), Title 18, United States Code, Section 3663A, the sentence includes restitution to the United States in the amount of $6,457,500.00. This Memorandum addresses the basis for the restitution portion of the Defendant's sentence.

The Court's determination of the restitution amount was based on extensive briefing, exhibits, and the testimony adduced at a hearing on September 14, 2012.[1] During the day-long

---

[1] The transcript for this hearing is not yet prepared, which prohibits full citation to the exhibits and testimony.

evidentiary hearing, the Court received evidence and heard testimony from two expert witnesses – the Government's expert witness, Internal Revenue Service Agent Nona Bosshart and Defendant's expert witness, Rodney Oakes, a former IRS Agent. At the sentencing, based on all files, matters of record, and proceedings, the Court, for the reasons stated in open court and on the record, ruled that the Government met its burden of proof by a preponderance of the evidence and determined an appropriate restitution amount.

### Standard For Finding Restitution Amount

The Government has the burden to prove the amount of restitution by a preponderance of the evidence. United States v. Pierce, 479 F.3d 546, 553 (8th Cir. 2007) (citing United States v. Oslund, 453 F.3d 1048, 1062 (8th Cir. 2006)). The United States Court of Appeals for the Eighth Circuit finds "this standard simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." United States v. Farrington, 499 F. 3d 854, 860 (8th Cir. 2007) (citing In re Winship, 397 U.S. 358, 371 (1970) (Harlan, J., concurring)). Furthermore, "the district court has wide discretion in ordering restitution." Id. (citing United States v. Ross, 210 F.3d 916, 924 (8th Cir. 2000)).

Defendant argues that the Court, "cannot blindly accept the Government's representations as to loss without some evidentiary basis." United States v. Petters, No. 08-364, 2010 US Dist LEXIS 55040, at *7 (D. Minn. June 3, 2010). Unlike the Petters case, where the number of victims and the complexity of the scheme made restitution complex, here, the Government is the one identified victim. The Defendant argues that the calculation of restitution amount is also too complex, citing Id. at *10, but even though the Government took more than four years to review Mr. Wirth's accounts, most of the Government's work was investigating the

crime and has not overly extended or complicated the restitution question. Once receipts and payments were tracked, the Government used a simple draw method to calculate the tax loss. In Pierce, the Government had a similar problem to the present case; that is, the accounting of the offending organization was fraudulent and thus the books were unreliable. 479 F.3d at 553-54 ("[Defendant] failed to maintain accurate financial records, and failed to submit audit reports as required."). The Court of Appeals upheld the award of restitution despite these uncertainties, relying on the calculations of the Government agency, "given the available information." 479 F.3d at 554. The Government's calculations are also supported by the available information, as explained more fully below.

## II. FINDINGS OF FACT[2]

1. Agent Nona Bosshart's testimony was thorough, exhaustive and credible.

2. Mr. Wirth incorporated thirty businesses. Twenty-seven of these were 100% owned and controlled by him. Two were 10% owned by his CFO, co-defendant, and then wife, Holly Damiani, and the remaining company was .01% owned by her [Gov't Ex. 2].[3]

**A. Personal Expenditures Claimed as Business Expenses**

3. Mr. Wirth improperly deducted credit card charges from 15-20 personal and company credit cards on his tax returns [Gov't Ex. 1011].

4. Mr. Wirth improperly deducted charges as business expenses for family vacations, including trips to Peru, Italy, Mexico, Ireland, and Greece.

---

[2]The findings of fact are not exhaustive, but rather are intended to highlight relevant testimony, exhibits and evidence considered in finding this restitution amount appropriate.

[3] Government's Exhibits were marked and entered at the Restitution Hearing on September 14, 2012.

3

5. Mr. Wirth improperly deducted personal trips, including to New Hampshire and Vermont.

6. Mr. Wirth improperly deducted personal medical expenses as business expenses.

7. Mr. Wirth improperly deducted personal boat expenses as business expenses.

8. Mr. Wirth improperly deducted entertainment expenses, including tickets to live entertainment events and to Golf Galaxy.

9. Mr. Wirth improperly deducted meal expenses, treating himself, friends, and family and deducting them under a "travel" expense designation.

10. Mr. Wirth improperly deducted medical and funeral expenses that he provided for a friend, but the Government did not learn about this until the restitution hearing and therefore did not include it in the Government's calculation of tax loss.

11. The Government understated the tax loss for personal expenditures. Where the Government did not have corroborating evidence from co-defendants or other witnesses, it erred on the side of not including the deduction in the tax loss calculation.

12. Mr. Wirth paid personal expenses with checks and improperly deducted these payments as business expenses. These improper deductions include checks paid for personal medical expenses, fitness club membership dues, boat expenses and laundry/dry cleaning [Gov't Ex. 1012]

13. Mr. Wirth made repeated transfers from company accounts to personal accounts, making cash withdrawals, each under $10,000 in what one witness claimed was an effort to "fly under the radar." Transactions of over $10,000 would have triggered reporting obligations.

Regardless of the motivation, these personal cash withdrawals were never properly recorded in the business' accounts.

**B. "Isle of Windemere"**

14. Mr. Wirth admitted, in his Plea Agreement, that he and his then-wife Holly Damiani "failed to report on their federal tax returns as distributions (1) over $2 million in company money spent in 2003 to fund the purchase of an island in St. Alban's Bay, Lake Minnetonka, on which the defendant and Ms. Damiani planned to build a home they hoped to live in; and (2) at least $3 million in company money spent from 2003 through 2006 to fund the design and construction of said home."

15. The Isle of Windemere entity did not file a tax return.

16. Other Wirth Companies paid Mr. Wirth distributions for the purchase, design, and building of the Isle of Windemere, and these funds were not properly recorded in company ledgers [Gov't Ex. 100, 1007].

**C. Understated Wages**

17. Mr. Wirth estimated his yearly wages at $12,000. This grossly underreported Mr. Wirth's annual personal income by more than $260,000 for tax years 2003-2005 [Gov't Ex. 510].

**D. Construction and Development Fees**

18. In the development of at least the Grand Rios Hotel and the Grand Lodge Hotel, Mr. Wirth pled guilty to understating on his income tax returns significant amounts of fee income earned. The Government compared the amount Mr. Wirth reported and the actual amount received and added the difference to their calculations of taxable income. Where applicable, the

5

Government gave Mr. Wirth the benefit of a standard straight line depreciation level of 39 years and applied that benefit to reduce tax liability [Gov't Ex. 240-244].

**E. Year-End Adjustments Smoothing Income with Management Fees**

19. Mr. Wirth and his co-conspirators moved money between profitable and unprofitable companies to smooth out income and lower their tax liability [Gov't Ex. 1002].

**F. Carryforward and Carryback**

20. Defendant's expert witness presented no calculations of his own for restitution.

21. Defendant's expert witness had no interaction with witnesses with regard to Mr. Wirth's expenses. He conceded that Ms. Bosshart's testimony tied the Government's analysis together with the narrative he had not understood prior to the hearing.

22. Defendant's expert averred Mr. Wirth's accounting books were "terrible."

23. Net operating losses being carried forward from 2003 and back from 2007 is not credibly based on reliable tax return information and does not serve as rebuttal to the Government's recreation of Mr. Wirth's finances.

### III. CONCLUSION

The Government charged Mr. Wirth with criminal activity from 2003-2005 and the Government has proven with a preponderance of evidence that Mr. Wirth caused the Government a tax loss of more than $6,457,500 million.

In this case, the Government has understated the tax loss restitution, giving Mr. Wirth the benefit of the doubt on occasions where the Government suspected fraud, but lacked sufficient witnesses confirming improper use of business funds. The Court finds no reason to allow Defendant to escape restitution when the confusion of record keeping is of his own making.

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

Restitution be paid as follows:

| Year Ending | Amount |
|---|---|
| December 31, 2003 | $2,132,760.00 |
| December 31, 2004 | $1,474,011.00 |
| December 31, 2005 | $2,850,729.00 |

For a total amount of restitution of $6,457,500.00

LET JUDGMENT BE ENTERED ACCORDINGLY.

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: September 20, 2012.